THE PEOPLE OF THE STATE OF NEW YORK ex rel. ALBERT J. HATCH, Appellant, v. EDWARD REARDON, a Peace Officer of the County of New York, Respondent.

1. STOCK TRANSFER TAX ACT— CONSTITUTIONAL REQUIREMENT AS TO PASSAGE OF LAWS — CONST. ART. 3, § 15.   The Stock Transfer Tax Act (L. 1905, ch. 241), alleged to be unconstitutional as having been passed without an emergency message before it had been on the desks of the members of the legislature in its final form for at least three calendar legislative days prior to its final passage, as required by section 15, article 3 of the Constitution, is not invalid for that reason, where it appears that the bill originated in the senate, lay on the desks of its members for three calendar legislative days in its final printed form, and also, in accordance with legislative practice, upon the desks of the members of the assembly during the same period and in the same form, was passed by the senate, and the second day thereafter by the assembly.    The word "members," as used in the constitutional provision, means members of the legislature as an entity, not members of the senate and assembly merely as such; it is not necessary that the members of the house in which a bill originates must first have it on their desks for three days, and after its passage by them the members of the other house must have it on their desks three more days, before they can pass it; the constitutional requirements are met, when a bill has been upon the desks of the members of each house, in its final form, for at least three calendar legislative days, whether simultaneously or otherwise.

2. VALIDITY OF TAXATION OF TRANSFER OF PARTICULAR CLASS OF PROPERTY ONLY.   The act imposes a tax, not upon property, but upon its transfer, and being uniform in its operation upon all transfers of the class named and upon all persons making such transfers within the state, is not obnoxious to the State or Federal Constitution as being so arbitrary, discriminating and unreasonable in taxing the transfer of one class of property only, as to deprive certain persons of their property without due process of law, and denying to them the equal protection of the laws.

3. VALIDITY OF TAX THOUGH NOT BASED UPON VALUES.   The tax imposed by the act being an excise tax imposed upon the transfer of a particular class of property does not depend upon any principle of valuation or any notice to the taxpayer; it is not a direct tax governed by the rule of appraisement but an indirect tax governed by the rule of uniformity: where there is no sale there is no tax: when there is a sale, the tax follows, which the legislature had the right to apportion in its discretion; it is valid, therefore, although not based upon the value of the certificates sold or of the sum for which they are sold.

4. Taxation of Transfers Made by Non-residents of Stock Issued by Foreign Corporations Valid Whether Tax Is Considered an Excise or a Property Tax. The fact, that transfers made within the state by non-residents of certificates issued by foreign corporations and owned by such non-residents are subject to the tax, does not constitute it a tax upon property without the jurisdiction of the state; regarded as a tax not upon property but upon the privilege of its transfer, the state has the right to tax all business done and all contracts made within its territory, although relating to property situated elsewhere, provided they are not protected as federal agencies, whether the business is done or the contracts are made by residents or non-residents; assuming, however, that the tax is in effect a tax upon property, the certificates may, for the purposes of taxation, be treated as property, and when found here are within the jurisdiction of the state and subject to the tax, so that whether regarded as a tax on the transfer of or upon the certificates themselves, it affects neither persons nor property without the jurisdiction of the state.

5. Validity Not Affected by Interstate Commerce Clause of Federal Constitution. The act does not violate the commerce clause of the Federal Constitution because it taxes transfers of certificates of stock in foreign corporations made by non-residents in this state; the tax is uniform, is upon the privilege of transferring within this state certificates of stock in all corporations, domestic or foreign, whether the transfers are made by citizens or non-residents; the fact that the certificates represent property situated in another jurisdiction is immaterial, and this would be true if it were a property tax. Interstate commerce means the exchange of property in one state for property in another state; where the certificates and the consideration received are here there is no transportation of either from another state, and there can be no movement of the property represented by such certificates; the tax, therefore, does not directly infringe upon interstate commerce. Assuming, however, that it is an indirect restraint thereon, in that it tends to prevent freedom of commercial intercourse, if there is no discrimination against persons or property from other states, that does not constitute such a substantial interference with interstate commerce as to amount to a state regulation thereof. State legislation which treats all persons, all property and all transfers of the same class in the same way under the same circumstances, and which does not directly or materially touch interstate commerce, does not violate the commerce clause of the Federal Constitution.

The authorities, relating to the points decided, collated and fully discussed.

*People ex rel. Hatch* v. *Reardon,* 110 App. Div. 821, affirmed.

(Argued March 5, 1906; decided April 17, 1906.)

Appeal from an order of the Appellate Division of the Supreme Court in the first judicial department, entered Feb-

ruary 1, 1906, which affirmed an order of Special Term dismissing a writ of habeas corpus and remanding the relator to custody.

On the 8th of June, 1905, the relator was arrested under a warrant issued by a justice of the Court of Special Sessions of the city of New York, charging him with the commission of a misdemeanor in that on the 7th of June, 1905, at the city of New York, he violated chapter 241 of the Laws of 1905 " by the sale and delivery of certain shares of stock of certain railroad corporations without making any bill or memorandum of such sale, or affixing any stamp or stamps to such a bill or memorandum, or in any way paying the tax as required by said act."

The complaint was made by a resident of the state of Connecticut against the relator, who is also a resident of that state. In his affidavit for the warrant the complainant swore that he was a broker by occupation and carried on that business at number 20 Broad street in the city of New York; that in said city, on the day named, the relator sold him " 100 shares of the common capital stock of the Southern Railway Company, a corporation organized under and by virtue of the laws of the state of Virginia and owning and operating a system of railroads situated wholly without the state of New York, of the par value of $100 per share, for the sum of $30.75 per share in cash, that being the then market value of said shares, and 100 shares of the common capital stock of the Chicago, Milwaukee and St. Paul Railroad Company, a corporation organized under the laws of the state of Wisconsin, and owning and operating a system of railroads situated wholly without the state of New York, of the par value of $100 per share, for the sum of $172 per share, that being the then market value of said shares."    On payment of the purchase price, amounting to $20,275, the relator delivered to the complainant two certificates of stock representing such shares, assigned in blank, " without affixing to any bill or memorandum thereof, or to any other paper, any stamp or stamps, and without paying any tax on making such sale and delivery,

although requested by deponent so to do, in violation of the provisions" of said act.

It did not appear when, by whom, from what place, or for what purpose, either certificate was brought into this state, or that it was brought here at all. The history of the certificates, so far as given, is simply that they were in the city of New York on the day named, and that they were then and there sold and delivered by the relator to the complainant.

A writ of habeas corpus issued to test the validity of said statute was dismissed by the justice of the Supreme Court before whom it was returnable and the usual order remanding to custody was made. Upon appeal to the Appellate Division the order was affirmed, one of the justices dissenting, and the relator appealed to this court.

*John G. Milburn* and *John F. Dillon* for appellant. The act is, because of its arbitrary and discriminating character and operation, a violation of the fundamental principles of the taxing power and a taking of property without due process of law, contrary to the Constitution of the state and of the United States, and it denies to holders of the stock of corporations the equal protection of the laws in violation of the fourteenth amendment to the Federal Constitution. (*Loan Assn.* v. *Topeka,* 20 Wall. 663 ; *State* v. *Switzerland,* 143 Mo. 287 ; Cooley on Taxn. [3d ed.] 72 ; *L. F. Co.* v. *Kentucky,* 188 U. S. 385 ; *U. T. Co.* v. *Kentucky,* 199 U. S. 194 ; *Genet* v. *City of Brooklyn,* 99 N. Y. 296 ; *People* v. *E. T. Co.,* 96 N. Y. 387 ; *Matter of McPherson,* 104 N. Y. 317 ; *Matter of Pell,* 171 N. Y. 48 ; *Yick Wo* v. *Hopkins,* 118 U. S. 356 ; *Claybrook* v. *Owensboro,* 16 Fed. Rep. 297.) The act is invalid because it arbitrarily fixes the amount of the tax regardless of the value of the shares sold or the sum for which they are sold. (*B. G. R. R. Co.* v. *Penn.,* 134 U. S. 232 ; *Jennings* v. *C. R. Co.,* 147 U. S. 147.) The act is invalid because in imposing a tax on sales of the shares of a foreign corporation owned by non-residents it is virtually a tax on property without the jurisdiction of the

1906.]     People ex rel. Hatch v. Reardon.     435

N. Y. Rep.]              Points of counsel.

state. (*State Tax on Foreign Held Bonds*, 15 Wall. 300; *Delaware Railroad Tax*, 18 Wall. 206; *People v. E. T. Co.*, 96 N. Y. 387; *U. T. Co.* v. *Kentucky*, 199 U. S. 194; *People* v. *Coleman*, 126 N. Y. 437; *Flynn* v. *Brooklyn City R. R. Co.*, 158 N. Y. 504; *Matter of Euston*, 113 N. Y. 181; *Matter of James*, 144 N. Y. 12; *Matter of Bronson*, 150 N. Y. 1; *Plymton* v. *Bigelow*, 93 N. Y. 592.) This tax law is void under the commerce clause of the United States Constitution because it taxes any sale within the state of New York of stock in a foreign corporation, though such stock belongs to a person not a resident of the state of New York, and such sale is made by such non-resident. (*Matter of Euston*, 113 N. Y. 174; *Jellinik* v. *H. C. M. Co.*, 177 U. S. 1; *Robbins* v. *S. C. T. District*, 120 U. S. 489; *Corson* v. *Maryland*, 120 U. S. 502; *Asher* v. *Texas*, 128 U. S. 129; *Stockard* v. *Morgan*, 185 U. S. 27; *Gibbons* v. *Ogden*, 9 Wheat. 1; *Brown* v. *Maryland*, 12 Wheat. 419; *Hopkins* v. *U. S.*, 171 U. S. 578; *Henderson* v. *Mayor, etc.*, 92 U. S. 259.) The statute in question was not passed by the assembly in accordance with section 15 of article 3 of the Constitution of the state of New York in this, to wit: That no bill was introduced into that body or sent from the senate into that body until April 4, 1905, one day before its final passage by that body April 5, 1905, and, therefore, the assembly did not comply with said section 15 of the Constitution. (*Thomas* v. *R. R. Co.*, 101 U. S. 71; *People* v. *Supervisors*, 8 N. Y. 317.)

*Julius M. Mayer, Attorney-General* (*John R. Dos Passos* of counsel), for respondent. The act is not "arbitrary and discriminating" in its character and operation, and does not violate "the fundamental principles of the taxing power," which we must assume is only a way of stating that it takes appellant's property "without due process of law," against the Federal and State Constitutions, and denies to the holders of the stock of corporations "the equal protection of the laws," in violation of the 14th amendment to the Constitution

of the United States. (*Knowlton* v. *Moore*, 178 U. S. 60; *Thomas* v. *U. S.*, 192 U. S. 363; *Nicol* v. *Ames*, 173 U. S. 509; *P. Ins. Co.* v. *Soule*, 7 Wall. 445; *Auer* v. *Washington Mills*, 11 Allen, 274; *Coulter* v. *L. & N. R. R. Co.*, 196 U. S. 599; *Matter of Prime*, 137 N. Y. 354; *Matter of McPherson*, 104 N. Y. 317; *Matter of Romaine*, 127 N. Y. 80; *Matter of Whiting*, 150 N. Y. 29.) The act neither creates discrimination nor produces confiscation of property, under the Constitution of New York or of the United States, or under the 14th amendment. (*H. B. Co.* v. *Henderson City*, 173 U. S. 592; *Nicol* v. *Ames*, 173 U. S. 518; *Matter of Whitney*, 150 N. Y. 30; *T. Ins. Co.* v. *Connecticut*, 185 U. S. 371; *Matter of McPherson*, 104 N. Y. 316; *Magoun* v. *I. T. & S. Bank*, 170 U. S. 293; *G. R. R. Co.* v. *Penn.*, 134 U. S. 232; *People* v. *H. Ins. Co.*, 92 N. Y. 337.) The law does not violate the commerce clause of the Constitution either between the states or as to foreign nations. (*Tinsley* v. *Anderson*, 171 U. S. 101; *Nicol* v. *Ames*, 173 U. S. 521; *Passenger Cases*, 7 How. [U. S.] 283; *State Tax on Foreign Held Bonds*, 15 Wall. 300; *S. Society* v. *Multnomah Co.*, 169 U. S. 421; *New Orleans* v. *Stempel*, 175 U. S. 309; *D. R. R. Tax*, 18 Wall. 206; *S. S. Co.* v. *Pennsylvania*, 122 U. S. 326; *V. & C. R. R. Co.* v. *V. C. R. R. Co.*, 63 Vt. 119; *People ex rel. C. C. Co.* v. *Morgan*, 178 N. Y. 439.)

*William Travers Jerome*, District Attorney (*E. Crosby Kindleberger* of counsel), for respondent. The act was properly passed. (Const. of N. Y. art. 3, § 15.) The tax was not one on property but on the exercise of a privilege. (*City of New York* v. *McLean*, 170 N. Y. 374; *Matter of McPherson*, 104 N. Y. 306; *Thomas* v. *U. S.*, 115 Fed. Rep. 207; 192 U. S. 363; *Orr* v. *Gilman*, 183 U. S. 329; *Clark* v. *Titusville*, 184 U. S. 329; *Cook* v. *Marshall Co.*, 196 U. S. 261; *Kehrer* v. *Stewart*, 197 U. S. 60; *French* v. *B. A. P. Co.*, 181 U. S. 324; *Cook* v. *Penn.*, 97 U. S. 566; *Brown* v. *Maryland*, 12 Wheat. 419.) The state had jurisdiction,

notwithstanding the fact that the shares transferred were those of foreign corporations. (*H. L. Ins. Co.* v. *N. Y.*, 134 U. S. 594; 92 N. Y. 328; *N. Y.* v. *Roberts*, 171 U. S. 658; *Matter of Palmer*, 183 N. Y. 328; *People* v. *Comrs.*, 4 Wall. 258; *Simpson* v. *J. C. C. Co.*, 165 N. Y. 193; *Kidd* v. *Alabama*, 188 U. S. 730; *U. T. Co.* v. *Kentucky*, 199 U. S. 194.) The act is not objectionable as depriving any person of his property without due process of law. (*Hagar* v. *Reclamation District*, 111 U. S. 701; *B. G. R. R. Co.* v. *Pennsylvania*, 134 U. S. 232; *U. S.* v. *Thomas*, 115 Fed. Rep. 207; 192 U. S. 363.) The Stock Transfer Act does not constitute a denial of the equal protection of the laws. (*B. G. R. R. Co.* v. *Penn.*, 134 U. S. 232; *Wright* v. *Hart*, 182 N. Y. 330; *K. R. R. Tax Case*, 115 U. S. 321; *P. E. Co.* v. *Siebert*, 142 U. S. 339; *W. & S. P. Co.* v. *Minn.*, 159 U. S. 526; *A. E. Co.* v. *Ohio*, 165 U. S. 195; *Magoun* v. *I. T. & S. Bank*, 170 U. S. 283; *Nicol* v. *Ames*, 173 U. S. 509; *A. S. R. Co.* v. *La.*, 179 U. S. 89; *Connolly* v. *U. S. P. Co.*, 184 U. S. 562.) The act is not in violation of the commerce clause of the Federal Constitution. (*Woodruff* v. *Parham*, 8 Wall. 123; *A. S. & W. Co.* v. *Speed*, 192 U. S. 520; *Kehrer* v. *Stewart*, 197 U. S. 60; *A. P. Co.* v. *Lacy*, 200 U. S. 226.)

VANN, J. The issue of law joined by the petition, return and reply is whether the legislature had power to enact, and did in fact enact, chapter 241 of the Laws of 1905, which provides for a tax on the sale and transfer of stock certificates. That act is part of the Tax Law, which it amends by adding a new article known as number fifteen. It imposes a tax " on all sales, or agreements to sell, or memoranda of sales or deliveries or transfers of shares or certificates of stock in any domestic or foreign association, company or corporation, made after the first day of June, 1905," of two cents " on each hundred dollars of face value or fraction thereof." Payment of the tax must be denoted by an adhesive stamp or stamps affixed in a manner adapted to the circumstances of the sale.

A violation of the act by a transfer without payment of the tax is made a misdemeanor and may be punished by fine, or imprisonment, or both, and the offender is also subject to "a civil penalty of five hundred dollars for each violation," to be recovered by the state comptroller in any court of competent jurisdiction. The statute further provides that no transfer of stock without payment of the tax "shall be made the basis of any action or legal proceedings, nor shall proof thereof be offered or received in evidence in any court in this state." The taxes thus imposed "and the revenues thereof shall be paid by the state comptroller into the state treasury and be applicable to the general fund, and to the payment of all claims and demands which are a lawful charge thereon."

The act is attacked as invalid on the ground that it was prematurely passed before it had been on the desks of the members of the legislature in its final form for at least three calendar legislative days prior to its final passage, as required by section 15, article 3 of the Constitution; that it makes an improper classification; that the tax is imposed on a wrong basis; that it is imposed upon property without the state, and that the act violates the commerce clause of the Federal Constitution.

After carefully considering these objections, we have reached the conclusion that they are not well founded and the following are our reasons, so far as we have found time to express them:

*First.* The statute in question originated, as a bill, in the senate, where it was amended from time to time and reprinted as often as it was amended. Printed copies thereof, as it was when introduced and as it was each time after it was amended, were promptly placed on the desks of the members of both houses when it was introduced and after each amendment. This was not required by any written rule of the legislature but was in accordance with the general practice that has prevailed since the Constitution of 1894 was adopted. The bill was passed by the senate on the third of April, 1905, was sent to the assembly for its concurrence on the fourth and was

finally passed by that body on the fifth, neither the governor nor the acting governor having certified to the necessity of its immediate passage. The journal of the assembly states that the bill was " printed and on the desks of the members in its final form at least three calendar legislative days prior to its final passage." These are, in substance, the facts relating to the subject as alleged in the petition for the writ and not denied in the return.

The Constitution provides that " No bill shall be passed or become a law unless it shall have been printed and upon the desks of the members, in its final form, at least three calendar legislative days prior to its final passage, unless the Governor, or the acting Governor, shall have certified to the necessity of its immediate passage, under his hand and the seal of the State." (Const. art. 3, § 15.)

The object of this provision, which first appeared in the Constitution of 1894, is to prevent hasty and careless legislation, to prohibit amendments at the last moment and to secure more publicity than had been required before. Care was taken to provide for emergencies by a certificate of necessity from the governor, which authorizes immediate action. The requirement is not directory, but mandatory, as is obvious from the form of the command, which prohibits a bill from becoming a law without compliance therewith. The question is, who are meant by " the members " upon whose desks the printed bill is to be placed? Does the provision mean that the members of the legislature are to have the bill on their desks for three days prior to its final passage, which was the fact in the instance before us; or that the members of the house in which it originated must first have it on their desks for three days, and after they have passed it the members of the other house must have it on their desks for three days more before they can pass it? If the latter is the true meaning of the requirement, it was not obeyed, for the bill was passed by the assembly on the second day after it was passed by the senate.

The Constitution created the legislature as an entity, con-

sisting of two houses, the senate and assembly.. In every article, except the last, which relates only to the date of operation, and in almost every section it recognizes the existence of the legislature, as such. Grants of power are made to the legislature and restrictions upon the exercise of power are directed to the legislature, not to the senate and assembly. Both senators and assemblymen are members of the legislature, and as such are required to take an oath of office. (Art. 13, § 1.) The command of the people is addressed to the legislature continuously throughout the fundamental law. Thus it provides that "no member of the Legislature shall receive any civil appointment within this State * * * during the time for which he shall have been elected," and that "no person shall be eligible to the Legislature" under certain circumstances (Art. 3, §§ 7 and 8); directs that "the members" shall not be questioned "for any speech or debate in either house of the Legislature" (Id. § 12); that senators and members of assembly shall be elected on a day named "unless otherwise directed by the Legislature" (Id. § 9); that "no private or local bill, which may be passed by the Legislature, shall embrace more than one subject" (Id. § 16); that "the. Legislature shall not pass a private or local bill" in certain cases (Id. § 18); that "the Legislature shall neither audit nor allow any private claim or account against the State" (Id. § 19); that the governor may "convene the Legislature, or the Senate only, on extraordinary occasions," and shall "communicate by message to the Legislature" (Art. 4, § 4); speaks of "the final adjournment of the Legislature" (Id. § 9); "the Legislature at its next meeting" (Id. § 5), and the "next session of the Legislature" (Art. 5, § 7); authorizes the legislature to alter judicial districts and create judicial departments (Art. 6, §§ 1 and 2); prohibits "the Legislature" from selling certain canals (Art. 7, § 8), and from suspending specie payments (Art. 8, § 5); requires it to provide a system of free common schools (Art. 9, § 1); to provide for filling vacancies in office (Art. 10, § 5); to organize the militia (Art. 11, § 3); to incorporate cities and villages

1906.]     People ex rel. Hatch v. Reardon.     441

N. Y. Rep.]     Opinion of the Court, per Vann, J.

(Art. 12, §§ 1, 2), and to submit proposed amendments to the people (Art. 14, § 1).

Many other sections, containing similar provisions, might be cited, but the foregoing are sufficient to show that while the senate and assembly are separate bodies, they constitute the legislature; that their united action becomes the act of the legislature and that the members of both houses are members of the legislature. A bill is the draft of a proposed statute submitted to the legislature for enactment. It cannot become a law by the action of the senate alone, or of the assembly alone, but only by the action of both, when it becomes an act of the legislature, subject to the approval of the governor. It may originate in either house and when introduced in either it is before the legislature, or else no bill can ever get before it, for each house is part of the legislature. When, therefore, the Constitution provides that no bill shall be passed unless it shall have been printed and upon the desks of " the members " in its final form for a certain period, it means the members of the legislature, not the members of the senate and assembly, merely as such. This is emphasized by the contrast in the form of the command when action is required by the members of each house separately, as in section twenty of article third relating to the requirement of "a two-third vote" upon a bill "appropriating the public moneys or property for local or private purposes." There the command is addressed " to the members elected to each branch of the Legislature," separately, instead of to the members of the legislature, collectively, which is the usual form. When the Constitution speaks of three calendar legislative days it means three calendar days of the legislature, or days when the legislature is in session. It does not mean six days, which the construction contended for would involve. The bill in its final form, that is in the form in which it becomes a law, must be on the desks of all members of both houses for three days before it is passed by either. But one occasion for placing it on the desks is named, not two separate occasions, the first confined to one house and the second to the other.

All members of the legislature are thus given notice of every bill when introduced into either house and when amended by either house.    No reprinting is required as the bill goes from one house to the other unless it has been amended, and whenever amended it must be reprinted.    Every member is informed at once of bills pending in either house, so that he can · promptly. study the proposed legislation, communicate with his constituents, note the comments of the press, observe the state of public opinion and appear before the committee to which the bill is referred in the house of its origin for the purpose of making suggestions before he is called upon to vote in his own house.    It prevents artful and dangerous amendments just before the final vote, which was formerly a great evil.    It has the same effect, so far as publicity and opportunity for deliberate consideration are concerned, as if every bill were introduced into each house at the same time. The construction thus indicated is reasonable and proper, for it follows the Constitution as written, complies with its spirit and fulfills its purpose.    It is in accordance with the practical construction of every legislature that has been in session since the provision was adopted, and the constitutional debates show that this was the construction of the convention which adopted it.   (Revised Records, 887, 917.)

We can give no heed to the criticism of counsel that there is no statute or written rule requiring bills to be placed on the desks of members, for it is not the province of the courts to direct the legislature how to do its work.    It is sufficient for us that the Constitution requires each house " to keep a journal of its proceedings " and that the journal of the assembly, which may be consulted to support a statute, shows that the constitutional provision in question was complied with when the act before us was passed.    (Art. 3, § 11.)

*Second.* The classification made by selecting one kind of property and taxing the transfer of that only, is assailed as so arbitrary, discriminating and unreasonable as to deprive certain persons of their property without due process of law and to withhold from them the equal protection of the laws.

All taxation is arbitrary, for it compels the citizen to give up a part of his property; it is generally discriminating, for otherwise everything would be taxed, which has never yet been done, and there would be no exemption on account of education, charity or religion, and frequently it is unreasonable, but that does not make it unconstitutional, even if the result is double taxation. (*People* v. *Home Ins. Co.*, 92 N. Y. 328, 347.) The right to tax is not granted by the Constitution but of necessity underlies it, because government could not exist or perform its functions without it. While it may be regulated and limited by the fundamental law, it exists "independently of it as a necessary attribute of sovereignty." (*People* v. *Adirondack Ry. Co.*, 160 N. Y. 225, 236.) "The power of taxation being legislative, all the incidents are within the control of the legislature. The purposes for which a tax shall be levied; the extent of taxation; the apportionment of the tax; upon what property or class of persons the tax shall operate; whether the tax shall be general or limited to a particular locality, and in the latter case, the fixing of a district of assessment; the method of collection, and whether a tax shall be a charge upon both person and property, or only on the land, are matters within the discretion of the Legislature and in respect to which its determination is final." (*Genet* v. *City of Brooklyn*, 99 N. Y. 296, 306.)

" A tax may be imposed only on certain callings and trades, for when the state exerts its power to tax it is not bound to tax all pursuits or all property that may be legitimately taxed for governmental purposes. It would be an intolerable burden if the state could not tax any property or calling unless at the same time it taxed all property or all callings." (*Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 562; *Armour Packing Co.* v. *Lacey*, 200 U. S. 226, 235.)

"We cannot say that treating stocks of corporations as a class subject to special restrictions was unjust discrimination or denial of the full protection of the laws." (*Otis* v. *Parker*, 187 U. S. 606, 610.)

" The Legislature must decide when and how and for what

public purposes a tax shall be levied and must select the subjects of taxation." (1 Cooley on Taxation [3rd ed.], 255.)

There is no express restriction upon this power in our State Constitution and no implied restriction, except by the primary guaranties relating to life, liberty, property and due process of law. The same is true of the Federal Constitution except as to certain subjects of national interest under the control of Congress, such as imports, patent rights and agencies used to carry the powers of Congress into execution. Subject to these restraints, the legislature has supreme control of the power to tax, and its action, even if arbitrary, discriminating and unreasonable, is binding upon all persons and property within the boundaries of the state. The state retained all the power of legislation that it did not part with in adopting the Federal Constitution or consenting to the amendment thereof, and subject to that exception, it is as supreme as the British Parliament, which is restrained only by the custom of the realm and the conservatism of the people. Taxes upon the right of succession to property by will and intestate law, on special franchises and upon the sale of intoxicating liquors, are recent instances of the exercise of this power by the state through the selection of special subjects of taxation, involving the exemption of all others, each of which was attacked as in violation of both Constitutions, but all were sustained by the courts. The tariff and internal revenue laws show that the same power of selection has been exercised by Congress, and the Federal courts have uniformly upheld it. Indeed, the prototype of the statute before us was an act of Congress passed in 1898, known as the "War Revenue Act," imposing a stamp tax on sales, transfers and deliveries of stock certificates, which was sustained without dissent by the Circuit and Supreme Courts of the United States. (30 U. S. Stat. 448; *United States* v. *Thomas,* 115 Fed. Rep. 207; 192 U. S. 363.) A like tax on sales of merchandise, although expressly limited to those made at "any exchange or board of trade," leaving all other sales untouched, was also sustained, and the declaration made that "a sale at an exchange does form a proper

basis for a classification which excludes all sales made else-
where from taxation." (*Nicol* v. *Ames*, 173 U. S. 509, 521.)

The legislature has power to classify as it sees fit by impos-
ing a heavy burden on one class of property and no burden
at all upon others, the remedy for injudicious action being in
the hands of the people, not of the courts. Arbitrary selec-
tion and discrimination characterize the history of legislation,
both state and national, with reference to taxation, yet, when
all persons and property in the same class are treated alike, it
has uniformly been sustained both by the state and Federal
courts. The tax on tobacco, on oleomargarine and the like is
not less arbitrary or discriminating than the tax in question.
While a tax upon a particular house, or horse, or the houses
or horses of a particular man, or on the sale thereof, would
obviously invade a constitutional right, still a tax upon all
houses, leaving barns and business buildings untaxed, or upon
all horses or the sale thereof, leaving sheep and cows untaxed,
however unwise, would be within the power of the legislature.
This is true of a tax on all houses with " more than one chim-
ney," or "with more than one hearth-stone," or on all race-
horses. The power of taxation necessarily involves the right
of selection, which is without limitation, provided all persons
in the same situation are treated alike and the tax imposed
equally upon all property of the class to which it belongs.
(*Matter of McPherson*, 104 N. Y. 306, 318; *Matter of Gould*,
156 N. Y. 423, 427.) The equal protection of the laws " only
requires the same means and methods to be applied impar-
tially to all the constituents of each class, so that the laws shall
operate equally and uniformly upon all persons in similar cir-
cumstances." (*Kentucky R. R. Cases*, 115 U. S. 321, 337.)
Or, in other words, all persons must "be treated alike
under like circumstances and conditions, both in the privilege
conferred and the liabilities imposed." (*Magoun* v. *Illinois
Trust and Savings Bank*, 170 U. S. 283, 293; *Hayes* v.
*Missouri*, 120 U. S. 68; *Barbier* v. *Connolly*, 113 U. S. 27,
32.) " Let it reach all of a class, either of persons or things,
it matters not whether those included in it be one or many, or

whether they reside in any particular locality or are scattered all over the state." (1 Cooley on Taxation [3rd ed.], 260.)

The tax in question is not imposed upon property, but on the transfer of a certain class of property, extensively bought and sold throughout the state. It does not discriminate between different kinds of stock, taxing the sale of some and leaving others untaxed, but treats all in the class alike. The class includes all sales of certificates issued by any domestic or foreign association, company or corporation. It is a large and comprehensive class, as is shown by the revenue produced, which amounts to five or six millions per annum. The sales affected are made chiefly for speculation which may have influenced the legislature in making the selection. The statute operates equally and uniformly upon all transfers of the class named when made by any person within the state. All persons who sell stocks are treated alike and all parts of the state are treated alike. It applies with equal force to all sales, whether in the city or country, in exchanges, offices or on the street, by farmers, mechanics, brokers and others. The classification violates neither Constitution.

*Third.* It is claimed that the statute is invalid because it fixes the amount of the tax regardless of the value of the certificates sold or of the sum for which they are sold.

The tax in question is an excise tax which need not depend upon any principle of valuation or on any notice to the taxpayer. It is not a direct tax governed by the rule of appraisement, but an indirect tax governed by the rule of uniformity. It is not like a general tax upon the bulk of property in the state which must be paid in any event, for if there is no sale there is no tax. Neither notice nor grievance day is required, for no valuation is made except by the statute itself, and there is no provision in either Constitution requiring such a tax to be laid on an *ad valorem* basis. There can be no tax without a sale, even if the property is of great value and is owned in every household. When a sale is made the tax follows, and the legislature had the right to measure it in any way that it saw fit.

A tax of two cents on every check, regardless of the amount for which it was drawn, and of five cents on a written contract, whether it covered a transaction involving hundreds or thousands, may be referred to as examples of what has been done without serious question in the imposition of excise taxes. A poll tax does not depend upon the income or earning capacity of the persons subjected to it. A tax on carriages, guns and watches does not rest on the value of the subjects taxed. They are counted, not appraised. (*Hylton v. United States*, 3 Dall. 171; *Bells Gap R. R. Co.* v. *Pennsylvania*, 134 U. S. 232, 237.) The same is true of an excise tax on legal process, domestic animals, avocations and the like of which there have been many instances during the history of the nation and the different states. Such powers of taxation, as was said in a late case, " have admittedly belonged to state and nation from the foundation of the government." (*Knowlton* v. *Moore*, 178 U. S. 41, 60.) " Of the different kinds of taxes which the State may impose, there is a vast number of which, from their nature, no notice can be given to the taxpayer, nor would notice be of any possible advantage to him, such as poll-taxes, license taxes (not dependent on the extent of his business) and generally, specific taxes on things, or persons, or occupations. In such cases the legislature fixes its amount and that is the end of the matter. * * * No right of his is therefore invaded. Thus if the tax on animals be a fixed sum per head, or on articles a fixed sum per yard, there is nothing the owner can do which can affect the amount to be collected from him." (*Hagar* v. *Reclamation District*, 111 U. S. 701, 709.)

Convenience in doing business, the slight cost of collection and the necessity of preventing evasion are important considerations in laying an excise tax and the rule of counting rather than valuing is almost universally adopted, so that the citizen may know at once the amount of the tax and pay it by affixing the stamps required, which are permanent evidence of the sum paid. The statute itself in all such cases, as well as in the case under consideration, apportions the tax

and the power of apportionment is part of the power of taxation.    As was said by this court many years ago : " The power of taxing and the power of apportioning taxation are identical and inseparable.    Taxes cannot be laid without apportionment, and the power of apportionment is, therefore, unlimited, unless it be restrained as a part of the power of taxation.    There is not, and since the original organization of the state government, there has not been any such constitutional limitation or restraint." (*People ex rel. Griffin* v. *Mayor etc., of Brooklyn*, 4 N. Y. 419, 427.)    The highest Federal court sustained without hesitation an assessment upon the nominal or face value of bonds instead of upon their actual value, and also declared that absence of notice to the owners of the bonds was not a taking of the bondholder's property without due process of law. (*Bells Gap R. R. Co.* v. *Pennsylvania*, 134 U. S. 232 ; *Jennings* v. *Coal Ridge Improvement & Coal Co.*, 147 U. S. 147.)    In the *Thomas* case, precisely as in the case before us, the tax was measured by " each hundred dollars of face value or fraction thereof."    As our legislature has all the power of legislation with reference to taxation that the state has, of necessity it has as much power to classify and measure as belongs to Congress.    Hence, this point as well as the last preceding, was involved and decided in the *Thomas* case even if no expression of consideration appears in the opinions (*United States* v. *Thomas*, 115 Fed. Rep. 207 ; 192 U. S. 363).    We think that the apportionment, even when so unequal in result as it was in the two sales described in the affidavit of the complainant, is within the exclusive control of the legislature, with no power in the courts to interfere.

*Fourth.* It is insisted that a tax on the transfer of stock certificates issued by a foreign corporation and owned by a non-resident, although made within this state, is virtually a tax on property without the jurisdiction of the state.

This position is founded on the theory that the shares of capital stock of a corporation represent its property and if that property is not within the state the shares are not taxable

1906.]    People ex rel. Hatch *v.* Reardon.    449

N. Y. Rep.]        Opinion of the Court, per VANN, J.

here unless the owner resides here. The tax, however, is not on property, but on the sale of property, or on a particular kind of contract when made within this state. The certificate, itself, is not liable for the tax, but the person selling it is. The tax is not a lien on certificates, nor on shares, which may be owned to any extent throughout the state, free from any claim under the statute in question. It is the sale alone that gives rise to the tax, which is imposed through the command of the law to the seller to pay the tax when the contract to sell is made, and it is enforced not by levy and sale, but by civil and penal remedies against the person of the seller. While this tax, the same as all other taxes, must ultimately come out of the property of the seller, it cannot be enforced against the certificate sold as distinguished from his other property.

The question is whether the state has jurisdiction to impose a tax on a certain class of contracts when made within its territorial limits? Jurisdiction over the persons who make the contract does not depend on their residence, but on their presence within the state when the contract is made. Jurisdiction over property depends on its physical presence here, or if it is personal property, either its presence here or the residence of the owner here. The fiction of the common law, *mobilia sequuntur personam*, has no foundation in the Constitution and does not control the legislature, which rejects or adopts it at will as applied to the subject of taxation. When two citizens of Connecticut come into this state and make a contract here, to be enforced here, both they and their contract are subject to its laws, and they are not only entitled to the protection thereof, but are under the same obligation to obey as if they were citizens. Such a contract is valid or invalid as our laws declare. When the law commands that if they, or any other persons, whether residents or not, make a certain contract here they must pay a certain tax for the privilege, the command is personal, addressed to them as persons then within the state, and is as binding on them as if they resided in the state. Their rights and their obligations in reference to such a contract are the same as if they were citizens, no greater and no less. The fact that the contract,

though made here, may relate to property, real or personal, situated elsewhere, has no bearing upon the question. By coming into the state they subjected themselves to its laws and to its taxing power, so far as the making of such a contract is concerned. It is immaterial whether the contract is between residents or non-residents, or between a resident and a non-resident, for if it is made within the state it is subject to taxation by the state. This necessarily follows from the power of the state over the subject of taxation. It has power to tax all property within its territory, all business done and all contracts made within that territory, provided they are not protected as Federal agencies, whether the property is owned or the business is done or the contracts are made by residents or non-residents. "It has never been questioned that the Legislature can impose a tax on all sales of property, upon all incomes, upon all acquisitions of property, upon all business and upon all transfers." (*Matter of McPherson,* 104 N. Y. 306, 317.)

We think such specific or excise taxes are laid upon privileges rather than on property. (*Orr* v. *Gilman,* 183 U. S. 278, 289; *Clark* v. *Titusville,* 184 U. S. 329; *Thomas* v. *United States,* 192 U. S. 363; *Foppiano* v. *Speed,* 199 U. S. 501, 520.) This was distinctly held in the *Thomas* case, and necessarily so held, for if a tax on certificates is a tax on property it is a direct tax requiring apportionment "among the several states * * * according to their respective numbers." (Art. 1, § 2, par. 3.) But, even assuming that a tax on the sale of property is, in effect, a tax on the property itself, what are certificates of stock and how may they be treated by the state for the purpose of taxation? They may be treated as property from the function they perform and the use that is made of them. They may well be regarded as a distinct species of property, for they now represent the bulk of property in the state and are the universal medium of transfer. As we said in a recent case: "The main use of certificates is for convenience of transfer, and they are treated by business men as property for all practical purposes. They

are sold in the market, transferred as collateral security to loans and are used in various ways as property. They pass by delivery from hand to hand, are the subject of larceny and are taxable generally in this State." (*Matter of Whiting*, 150 N. Y. 27, 30.) Although issued by a foreign corporation and owned by a non-resident, if they are found within the state they may be seized under a warrant of attachment. (*Simpson* v. *Jersey City Contracting Co.*, 165 N. Y. 193.) Speaking of the nature of a share of stock, Mr. Justice NELSON declared it to be " a distinct, independent interest or property, held by the stockholder like any other property that may belong to him, and, of course, subject to like taxation." (*People* v. *Com'r*, 4 Wall. 244, 258.) And in another case it was said : " Shares of stock may be within a state and the property of the corporation outside of it." (*Kidd* v. *Alabama*, 188 U. S. 730, 733.)

It does not appear how long the certificates in question had been in the state, or that they were here for some temporary purpose when they were sold by the relator to the complainant. For aught that appears they had been here for years in the possession of the owner, or deposited for safekeeping and had a *situs* here, so that they were subject to taxation here. They may have been bought here by the relator on the day of sale, and up to that time they may have been owned and in the possession of a resident of the state for year after year. The state found them here, and the presumption, in the absence of evidence to the contrary, is that they were subject to taxation here. If, owing to special circumstances, they were not, it was incumbent upon the relator to prove the fact. The legislature had the right to treat them as property and make them property for the purpose of taxation the same as it treats a bank deposit as money, although in reality it is a debt. (*Matter of Houdayer*, 150 N. Y. 37 ; *Matter of Romaine*, 127 N. Y. 80, 88.) We think that the tax, whether it is regarded as a tax on the sale of stock certificates or on the certificates themselves, touched neither person nor property without the jurisdiction of the state.

*Fifth.* The final objection urged against the statute is that it violates the commerce clause of the Federal Constitution because it taxes the transfer of certificates of stock in a foreign corporation when made by a non-resident in this state.

The commerce clause provides that Congress shall have power " to regulate commerce with foreign nations and among the several states and with the Indian tribes." (Art. 1, § 8, par. 3.) The omission of Congress to exercise this power in any case is an expression of its will that the subject shall be left free from restrictions upon it by the states. (*Robbins* v. *Shelby County*, 120 U. S. 489.) Commerce is the commanding word in the simple but weighty sentence quoted from the Constitution. What is commerce ? According to the derivation, history and use of the word it is the exchange of property and includes the usual agencies of communication and transportation employed to effect the exchange. Thus it extends to whatever is used to move the property involved and the persons engaged in making the contract. Interstate commerce, or commerce among the states, means the exchange of property in one state for property in another state. Its essential characteristic is that the property affected must be transported to some point without the state. There must be interstate movement of property. The telegraph cases do not conflict with this view, for the telegraph practically transports either news or money. The interchange may be between residents of different states or residents of the same state, but the property exchanged must move from one state to another. There can be no interstate commerce without interstate transportation of property, which includes money as well as merchandise and whatever can become the subject of exchange.

Even upon the assumption that certificates of stock are property, the transaction in question involved no movement of property from one state to another, for so far as appears neither money nor property was brought into the state or taken out of it. A citizen of Connecticut met another citizen of that state in the city of New York and there bought the certificates of him, which were delivered and paid for on the

spot. There is no statement in the record that the certificates were brought here to sell, or that the money used was brought here to purchase them. As we have seen, the certificates may have been here for years and this is true of the money also, for it belonged to a broker who carried on business at his office in the city of New York. There was an exchange of certificates for money made in this state, without the transportation of either from another state, as we must presume from the record. This was commerce but not interstate commerce, because no property moved from one state to another. It was not commerce among states, within the meaning of the Constitution, as we read it. The fact that both actors in the transaction were non-residents has no bearing on the question, for commerce among the states does not depend on the residence of the parties but on the interchange of property between different states. The exchange in question was made here, the property exchanged was situated here and, so far as we are advised, nothing was brought into or taken out of the state in order to make the exchange, or as the result of the exchange as made. The fact that the certificates were issued by foreign corporations, operating railroads in other states, did not involve the movement of property from one state to another, any more than if A grants to B lands in Kansas by a deed given in this state. The stockholder's interest in the foreign corporation could not be brought into the state of New York and the certificates, which represent that interest, are presumed to have had a taxable *situs* here.

The discussion of this point has proceeded thus far on the theory that the tax is in substance a tax on property, but, as we have held, it is in fact a tax only on the privilege of transfer. But it is insisted that a tax on the privilege of transferring certificates issued by foreign corporations, when the transfer though made here is between non-residents, tends to prevent freedom of commercial intercourse and, hence, is a restraint upon interstate commerce. The direct effect of a tax on the privilege of making a contract in this state, to be per·

454       People ex rel. Hatch *v.* Reardon.       [April,

Opinion of the Court, per Vann, J.          [Vol. 184.

formed in this state, does not infringe upon interstate com-
merce because it does not involve the movement of property
between states.  Should the indirect effect be regarded as a
restraint upon interstate commerce?  If so, where is the
application of the principle to stop, for if pushed to its logical
conclusion the states will be prevented from managing their
own affairs.   The commerce clause was not intended to hamper
state legislation, even if the indirect result should remotely
affect commerce "among the several states."  It was not
designed to hinder the preservation of order or the procure-
ment of means to that end by the taxation of transfers
made within the state, even if they are from one non-resi-
dent to another and indirectly touch property without the
state.   It is the regulation of commerce that is impli-
edly forbidden and the regulation of commerce does not
include everything distantly connected therewith.   Remote
and indirect results do not interfere with interstate commerce.
A homely illustration will show my meaning.  Two boys
trade knives, that is commerce in its simplest form.   If they
live on opposite sides of a state line and the bargain is made
on one side but delivery on the other, it is interstate com-
merce.   If one of them is flogged for it, that is not interfer-
ence with interstate commerce, even if it discourages inter-
state traffic.   This example is not used to belittle an impor-
tant subject, but to illustrate the fact that the indirect effect
of state action is not prohibited, unless it discriminates against
persons or property from other states, or necessarily has the
effect of touching interstate commerce in some substantial
way. · A tax on the transportation of persons or property
between states, or on the business of carrying it on, is direct
it. its effect and is a tax on commerce, but in a recent case,
which held that a cab service maintained by a railroad for the
use of interstate passengers is not interstate commerce, it was
said: "Many things have more or less close relation to inter-
state commerce, which are not properly to be regarded as a
part of it.   If the cab which carries the passengers from the
hotel to the ferry landing is engaged in interstate transporta-

tion, why is not the porter who carries the traveler's trunks from his room to the carriage also so engaged? If the cab service is interstate transportation, are the drivers of the cabs and the dealers who supply hay and grain for the horses also engaged in interstate commerce? And where will the limit be placed?" (*New York ex rel. P. R. R. Co.* v. *Knight*, 192 U. S. 21, affirming *People ex rel. Penn. R. R. Co.* v. *Knight*, 171 N. Y. 354.)

While interstate commerce, as such, cannot be taxed at all, the property employed therein may be taxed, even if it is used to facilitate interstate traffic, such as the rolling stock of a foreign railroad corporation running cars into one state from another. (*Pullman Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18.) In deciding this case the court said: " There is nothing in the Constitution or laws of the United States which prevents a state from taxing personal property, employed in interstate or foreign commerce, like other personal property within its jurisdiction. (Citing *Delaware R. R. Tax*, 18 Wall. 206, 232; *Telegraph Co.* v. *Texas*, 105 U. S. 460, 464; *Gloucester Ferry Co.* v. *Penn.*, 114 U. S. 196, 206, 211; *Western Union Telegraph Co.* v. *Attorney-General of Mass.*, 125 U. S. 530, 549; *Marye* v. *Baltimore & Ohio R. R. Co.*, 127 U. S. 117, 124; *Leloup* v. *Mobile*, 127 U. S. 640, 649.) " A railroad company engaged in interstate commerce and operating a railroad lying partly within and partly without a state " is liable to pay an excise tax according to the value of the business done in the state." (*Maine* v. *Grand Trunk Ry. Co.*, 142 U. S. 217.)

A state cannot regulate interstate commerce, for Congress only has that power, but as it can tax property employed therein the same as all other property, it can tax the privilege of transferring such property, provided it treats non-residents the same as residents and subjects all transfers in the same class to the same tax. If there is no discrimination in favor of domestic commerce, there is no attack on interstate commerce, for the indirect effect of such a tax is no greater than one laid on property used therein. Taxation of a telegraph company, doing an interstate business, upon its prop-

456          People ex rel. Hatch *v.* Reardon.          [April,

Opinion of the Court, per Vann, J.          [Vol. 184.

erty within the state is valid, but a statute authorizing an injunction to restrain the company from transacting business until an overdue tax is paid, is invalid, because it interferes with an act of Congress relating to post roads. The tax did not interfere, as the result was indirect, but the injunction did, because it was direct in its effect. (*Western Union Tel. Co.* v. *Massachusetts*, 125 U. S. 530.)

A tax on the right to engage in interstate commerce, as by a commercial traveler, was held void as an attempt to regulate a subject under Federal control, but that is quite different in principle from a tax on all transfers of a certain kind of property, which, like all other property, may at times enter into interstate transactions, but is not peculiar thereto. (*Robbins* v. *Shelby County*, 120 U. S. 489.) The tax before us is not on the transfer of stock in foreign corporations, but on the transfer of stock in all corporations. " A uniform tax imposed by a state on all sales made in it, whether they be made by a citizen of it or a citizen of some other state, and whether the goods sold are the produce of the state enacting the law or of some other state, is valid," because " there is no attempt to discriminate injuriously against the products of other states or the rights of their citizens, and the case is not, therefore, an attempt to fetter commerce among the states, or to deprive the citizens of other states of any privilege or immunity possessed by the citizens of " the state in question. (*Woodruff* v. *Parham*, 8 Wall. 123, 140; *Brown* v. *Houston*, 114 U. S. 622; *Emert* v. *Missouri*, 156 U. S. 297; *American Steel & Wire Co.* v. *Speed*, 192 U. S. 500.)

So a tax on all meat-packing houses in a state, or on the agents thereof, is valid although some do an interstate as well as a domestic business. (*Armour Packing Co.* v. *Lacey*, 200 U. S. 232; *Kehrer* v. *Stewart*, 197 U. S. 60.) A tax on the gross commissions of brokers derived, wholly in one instance and partly in another, from sales made in behalf of many non-resident principals who shipped goods from without the state for sale, was held to affect interstate commerce only so " incidentally and remotely as not to amount to a regulation "

thereof. (*Ficklen* v. *Shelby County*, 145 U. S. 1.)  Where
the business of the brokers was not general, with the right to
engage in all kinds, but was in terms limited to specific, non-
resident principals, the effect was held to be direct and the
tax void. (*Stockard* v. *Morgan*, 185 U. S. 27, 37.)  The
cases distinguish, carefully and critically, between direct
and remote results and with reason, for the Constitution is
not sensitive to clouds on the horizon but to clouds overhead.
In the nature of things every slight and incidental conse-
quence of state action does not constitute state regulation, for
this would lead to sad confusion and leave the subject in per-
petual doubt.  Attention should be paid to the interests of
the state as well as those of the nation and a construction just
to both should be adopted.  The legislative power of the state
should not be shackled, and the commerce clause of the Con-
stitution should not be frittered away by extreme views in
either direction.  Immaterial, indirect and remote effects
should be ignored and substantial results alone considered.
As Mr. Justice PECKHAM recently said : " The effect upon the
commerce spoken of must be direct and proximate.  (*N. Y.,
L. E. & W. R. R. Co.* v. *Penn.*, 158 U. S. 431, 439.)  An
agreement may in a variety of ways affect interstate com-
merce, just as state legislation may, and yet, like it, be entirely
valid, because the interference produced by the agreement or
by the legislation is not direct."  (*Hopkins* v. *United States*,
171 U. S. 578, 594, citing *Sherlock* v. *Alling*, 93 U. S. 99, 103 ;
*United States* v. *E. C. Knight Co.*, 156 U. S. 1, 16 ;  *Pitts-
burg & Southern Coal Co.* v. *Louisiana*, 156 U. S. 590, 597 ;
*Transportation Co.* v. *Parkersburg*, 107 U. S. 691 ; *Ficklen*
v. *Shelby County*, 145 U. S. 1.)

The principles governing interstate commerce are in process
of development, and, as is usually true in evolving the law
out of many complicated cases, the treatment by the courts
has not always been uniform or consistent.  We think, how-
ever, that the weight of authority regards state legislation,
which treats all persons, all property and all transfers of the
same class in the same way under the same circumstances,

and which does not directly or materially touch interstate commerce, as not amounting to state regulation. While restraint by the state is regulation by the state, it must be direct or substantial to have that effect, and the statute under consideration falls under neither head. The question is not whether the statute is wise, but whether it is valid, and we think it is valid.

The order appealed from should be affirmed.

CULLEN, Ch. J., O'BRIEN, HAIGHT, WERNER, WILLARD BARTLETT and HISCOCK, JJ., concur.

Order affirmed.