30 N.Y.2d 207 (1972)
Finger Lakes Racing Association, Inc., Appellant,
v.
New York State off-Track Pari-Mutuel Betting Commission et al., Respondents, and City of New York et al., Intervenors-Respondents.
Mid-State Raceway, Inc., Appellant,
v.
New York State off-Track Pari-Mutuel Betting Commission et al., Respondents, and City of New York et al., Intervenors-Respondents.
Saratoga Harness Racing, Inc., Appellant,
v.
New York State off-Track Pari-Mutuel Betting Commission et al., Respondents, and City of New York et al., Intervenors-Respondents.
Sullivan County Harness Racing Association, Inc., Appellant,
v.
New York State off-Track Pari-Mutuel Betting Commission et al., Respondents, and City of New York et al., Intervenors-Respondents.
Court of Appeals of the State of New York.
Argued February 7, 1972.
Decided March 23, 1972.
Ernest B. Morris and Ralph D. Semerad for Saratoga Harness Racing, Inc., appellant.
William D. Kiley for Mid-State Raceway, Inc., appellant.
Frank G. Raichle and Ralph L. Halpern for Finger Lakes Racing Association, Inc., appellant.
George Morton Levy, Louis Haimoff, John McBride and S. Harvey Fosner for Sullivan County Harness Racing Association, Inc., appellant.
Louis J. Lefkowitz, Attorney-General (Jean M. Coon and Ruth Kessler Toch of counsel), for respondents.
J. Lee Rankin, Corporation Counsel (Alfred Weinstein, Stanley Buchsbaum and Jonathan T. Shearer of counsel), for City of New York and another, intervenors-respondents.
Leonard J. Litz, Corporation Counsel (Davis M. Etkin of counsel), for City of Schenectady, respondent.
No appearance for Rensselaer and Greene Counties, respondents.
Judges SCILEPPI, BREITEL and JASEN concur with Judge BERGAN; Judge BURKE dissents and votes to reverse in an opinion in which Chief Judge FULD and Judge GIBSON concur; Chief Judge FULD dissents in a separate opinion in which Judge GIBSON also concurs.
*215 BERGAN, J.
Plaintiffs are corporations engaged under State license in the business of operating horse racetracks and conducting gambling operations by pari-mutuel systems of betting. In these four actions against the New York State Off-Track Pari-Mutuel Betting Commission, the New York State Racing Commission and other parties having an adverse interest in the controversy, plaintiffs seek judgment declaring chapters 143 and 144 of the Laws of 1970 unconstitutional and restraining official action under those chapters.
These enactments together constitute articles V and VI of the Pari-Mutuel Revenue Law (L. 1940, ch. 254). Chapter 143 of the Laws of 1970 established defendant Off-Track Pari-Mutuel Betting Commission and authorized it to provide for a system of off-track pari-mutuel betting by approved participating municipalities or public benefit corporations for the operation of such systems, and authorized the commission itself to operate such systems (§§ 67, 68, 69).
Chapter 144 expressly created the New York City Off-Track Betting Corporation as a public benefit corporation for the *216 operation of such a system within New York City. That corporation and the city itself are intervening defendants in the actions.
Plaintiffs claim that their property and financial interests in the gambling and horse-racing business are adversely affected by the off-track betting system authorized by the 1970 amendments; that their prior investments in plant and organization have been impaired, and their property required to be used by public authority, for the purposes of the statutes, to the extent they are deprived of property without due process.
Additionally they allege that in purpose, and in form of enactment, the statutes fail to meet relevant requirements of the New York Constitution. The court at Special Term, upholding the validity of the 1970 enactments, granted judgment for the defendants. The appeals by plaintiffs are here directly on constitutional grounds.
From an absolute constitutional prohibition on gambling in New York of any kind, expressly including "book-making", which has stood almost 80 years in the New York Constitution (art. I, § 9), a specific exception was carved out in 1939. This exception was "pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government".
Plaintiffs argue that the statutes here challenged did not provide a reasonable revenue for the support of the State government and, therefore, were not valid enactments. At least one of them argues that under the 1939 amendment, the State itself must be the "exclusive beneficiary of pari-mutuel revenues".
Implicit in this last argument, of course, is the premise that unless the State itself gets all the pari-mutuel revenues, the exception of the 1939 amendment is inoperative. Since the exception is addressed to an absolute prohibition, if the exception is inoperative no pari-mutuel betting would be permissible. It would follow out from the argument that unless the State received all revenue from the betting, the general prohibition would remain operative. But plaintiffs, which derive substantial portions of those revenues from betting, do not follow the argument to that end. And, indeed, the Constitution merely provides the State shall derive "a reasonable revenue".
*217 The State's revenue share of off-track betting is fixed by the Pari-Mutuel Revenue Law. It imposes a tax of one half of 1% on all off-track pari-mutuel bets (§ 69-c). After operating expenses of the public benefit corporation conducting the system have been paid, 80% of the net revenues up to the point of $200 million are to go to the participating municipality, and 20% to the State. If they exceed $200 million, the State and the participating municipality each receives half (§ 69-c, subd. 4).
This distribution is on its face a "reasonable revenue" for the support of government within the constitutional language. What is a reasonable revenue as a question of judgment and value is normally within the legislative province. But, additionally, as to pari-mutuel gambling, the permission to allow it at all, and the requirement for a reasonable revenue for the support of government, are specifically tied in together following, and affected by, the same constitutional expression "as * * * prescribed by the legislature". This necessarily includes both the terms of the revenue benefit as well as the overall permissive exception to the gambling prohibition.
Plaintiffs suggest that revenues which go to the support of municipal governments are not for the support of "government" within the constitutional language, or at least not for the support of State government. But the part of the net revenues which go to the participating municipalities is so closely tied in to the interrelated financial dependence of the local governments on the State, that fiscal assistance through a State agency to the political subdivisions of the State must be regarded as revenue for the support of State government, since it may, and the Legislature could reasonably conclude that it will, proportionately benefit the State's revenues. The result in the end is a fiscal bookkeeping balance between governments. The beneficial effect on the State treasury of revenue passing on to municipal governments which are creatures of the State is very different from private profits arising from pari-mutuel races by corporations operating tracks and pari-mutuel systems.
The 1968 decision of the court in Saratoga Harness Racing Assn. v. Agriculture & N. Y. State Horse Breeding Development Fund (22 N Y 2d 119) was addressed directly to the requirement *218 of article I (§ 9) of the Constitution that a reasonable revenue shall be derived for the support of government from any authorized pari-mutuel betting on horse races.
There the plaintiff, a licensed private horse racing corporation (also a plaintiff in one of the present actions), sought to enjoin the defendant Horse Breeding Development Fund from collecting a portion of the "breaks" (odd amounts) received by private racing associations. This was authorized by section 55-c of the Pari-Mutuel Revenue Law, as added by chapter 567 of the Laws of 1965.
The statute authorized the defendant fund to collect 25% of the "breaks", to use the proceeds to establish a fund to foster growth and prosperity of the industry in various programs. Plaintiff argued there that such a use of revenue, though taken and disbursed by the fund as a public benefit corporation, did not provide reasonable revenue for the support of the State government and, therefore, the 1965 statute violated the constitutional provision.
Although the court divided on another constitutional issue in that case, it was unanimous in the view that the statute was consistent with article I (§ 9). The minority accepted the view expressed in Judge KEATING'S opinion for the court that the constitutional requirement that a reasonable revenue be derived for support of government had been met in that statute (see dissenting opn. by Judge BREITEL, p. 129).
The opinion of the court expressed the view that the legislative act requiring a certain portion of the revenues derived from racing be set aside for the general improvement of the sport and the facilities sufficiently met the constitutional test. The opinion concluded on this point: "The Agriculture and New York State Horse Breeding Fund is the instrument through which the Legislature has chosen to effectuate this legitimate public interest and purpose. We perceive no constitutional impediment arising out of section 9 of article I which requires that this legislative scheme be struck down" (p. 123).
If the direct support of the public functions of municipal governments authorized by the 1970 statutes were less clearly within the term "reasonable revenue for the support of government" than on its face it seems to be, the decision of the *219 court in Saratoga Harness Racing Assn. (supra) would be decisive for validity.
An additional point of constitutional infirmity in the 1970 statutes argued by the appellant corporations is that the Governor's message to the Legislature of April 19, 1970, which accelerated the vote on the off-track betting proposal, did not comply with article III (§ 14) of the Constitution. This provision postpones the enactment of bills for at least three days after copies are in final printed form on legislative desks.
That time lapse may be cut down, and consideration advanced, if the Governor certifies to the Legislature "the facts which in his opinion necessitate an immediate vote thereon". The Governor's certificate of April 19 described the general purposes of the bill to establish a system of off-track pari-mutuel betting and certified that because the bill had not been on the legislative desks three days "the Leaders of your Honorable bodies have requested this message to permit immediate consideration of the bill prior to your anticipated final adjournment".
Although the proposal had been introduced in the Senate April 18 and adjournment actually occurred on April 22, the bill could not reasonably have been in final printed form for three days before adjournment and the imminence of adjournment on April 19, when the message was sent, was sufficient to justify the certificate for the reasons stated by the Governor. It was passed by the Senate on April 19, the date of the certificate, and by the Assembly the following day.
The time sequence shows the bill could not have been considered by the Legislature unless the certificate had been given and the public interest in its consideration is made conclusive by the fact the Legislature decided not only to consider it but to pass it. The request by the leaders of both houses to the Governor for a certificate shortening the time to permit consideration of the bill before adjournment was to make legislative action possible.
This is a compliance in terms and in spirit with article III (§ 14). It is the Governor who must express the opinion that an immediate vote is desirable. The facts on which he forms that opinion must satisfy him. The facts supporting his opinion of April 19, are rational and reasonable. If the proposal is to be *220 considered a certificate must be given. This on its face is a sufficient compliance with the Constitution.
The Legislature could still say the time for consideration was too short. It did not say that, but accepting the Governor's certificate and considering the proposal in the time available, it passed it.
Normally a court should not intervene to nullify an act of the Governor addressed to legislative action which literally and reasonably conforms with constitutional requirements (cf. People ex rel. Hatch v. Reardon, 184 N.Y. 431; People ex rel. Broderick v. Morton, 156 N.Y. 136).
Plaintiffs' argument that the off-track betting statutes deprive them of property without due process is based in part on the fact they each operate on-track pari-mutuel systems of betting as well as race tracks and that the convenience to the bettor of gambling near his home will reduce revenues both from attendance and from on-track betting.
Since plaintiffs allege large investments in these enterprises, this new State-fostered competition is alleged to result in losses. More specifically it is alleged the off-track betting systems will utilize betting odds, race results and other similar products of plaintiffs' enterprise and organization, without just compensation, as well as their physical and electronic facilities.
Plaintiffs, in operating commercial gambling enterprises, are under peculiar constitutional disabilities in New York. A gambling enterprise is entirely prohibited by article I (§ 9) of the Constitution. Unless the Legislature permits the operation of the gambling part of plaintiffs' business they cannot receive and pay bets on horse races.
Continuance of this kind of business depends on legislative permission, and this permission may be conditioned and the imposed conditions altered from time to time according to the legislative view of fairness. The Legislature could probably not be grossly destructive of investments of time and money made on faith of its past permission, but it should be able to reapportion the profit results of the gambling business, including the allocation of a greater share for public benefit.
The court at Special Term was of opinion in this respect the gambling enterprises of plaintiffs were somewhat similar to the liquor business, citing Seagram & Sons v. Hostetter (16 N Y 2d 47, affd. 384 U. S. 35). *221 There is a difference, of course, between these enterprises, but the difference in constitutional rights tends to favor the liquor industry. Liquor is permitted unless prohibited; in New York gambling is prohibited unless permitted.
The off-track pari-mutuel statute does, indeed, attempt to compensate the racetrack owners for the use of their facilities. The arrangement seems reasonably fair. It is certainly not grossly unjust or unreasonable. The hazard of engaging in a business which may be altered by public authority under the police power is generally recognized (California Auto. Assn. v. Maloney, 341 U. S. 105, 110 [1951]; Breard v. Alexandria, 341 U. S. 622, 632-633 [1951]; Day-Brite Light. v. Missouri, 342 U. S. 421, 424 [1952]; United States v. Central Eureka Min. Co., 357 U. S. 155, 168 [1958]).
The judgment should be affirmed, without costs.
BURKE, J. (dissenting).
This appeal presents the constitutionality of the New York State Off-Track Pari-Mutuel Betting Law and the New York City Off-Track Betting Corporation Law, enacted by chapters 143, 144 and 145 of the Laws of 1970. Plaintiffs-appellants appeal from an order and judgment of the Supreme Court, Albany County, which sustained the validity and constitutionality of the off-track betting laws. Passed under a message of necessity from the Governor (N. Y. Const., art. III, § 14), the instant legislation was enacted pursuant to article I (§ 9) of the State Constitution to provide off-track pari-mutuel betting.
Appellants attack the constitutionality of chapters 143 and 144 on several grounds and raise several constitutional issues. Turning to the most cogent of appellants' arguments, I find myself in agreement with their contention that the present off-track betting laws contravene article I (§ 9) and article VII (§ 7) of the State Constitution and, therefore, am for reversal. However, in reversing, I would hold that the present statutory scheme is only narrowly unconstitutional.
Article I (§ 9) prohibited gambling "except pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government". Appellants assert a two-fold violation: (1) the Constitution (art. I, § 9; art. VII, § 7) prohibits *222 local governmental units from extracting revenue from off-track betting, i.e., the State was to be the exclusive beneficiary of the revenue and was to appropriate the money through proper legislative channels; (2) the State does not derive a reasonable amount of revenue as a matter of law.
It is the principal objection of appellants that the language of the Constitution (art. I, § 9) permits only the State to derive revenue from pari-mutuel betting. Therefore, the revenue so derived being State funds to be received in the State treasury, the disbursement of these funds should be appropriated in accord with constitutional requirements (art. VII, § 7). I agree.
At the outset, while I recognize the strong legal presumption favoring the constitutionality of legislation (McKinney's Cons. Laws of N. Y., Book I, Statutes, § 150; Lincoln Bldg. Assoc. v. Barr, 1 N Y 2d 413; Defiance Milk Prods. Co. v. Du Mond, 309 N.Y. 537; Matter of Ahern v. South Buffalo Ry. Co. 303 N.Y. 545, affd. 344 U. S. 367), I think this is one of those rare instances where the presumption should not be indulged. The key section involved herein is section 69-c of the Pari-Mutuel Revenue Law which imposes a tax of ½ of 1% on all off-track pari-mutuel bets and is to be paid from the retained percentage by the commission and each participating municipality and public benefit corporation. The retained percentage is 17% on harness races and 16% on running races and steeplechases (§ 69-c, subd. 1). In addition, from the retained percentages, the expenses of operation and administration of off-track betting systems are to be paid (§ 69-c, subd. 3). Net revenues remaining after payment of all expenses is distributed in the following manner: (1) 80% to the participating municipality, (2) 20% to the general fund of the State treasury. If the net revenues exceed 200 million dollars, the breakdown is 50-50 on the excess over 200 million (§ 69-c, subd. 4).
Defendants-respondents rely upon Saratoga Harness Racing Assn. v. Agriculture & N. Y. State Horse Breeding Development Fund (22 N Y 2d 119 [KEATING, J.]) as controlling on the question appellants raise concerning the distribution of revenue. In Saratoga, we held: "[t]here is nothing in the amendment which requires that all revenue in excess of expenses be devoted to the direct support of government or which prohibits the Legislature, as a condition to granting a license to a private racing *223 association, from requiring that a certain portion of the revenues derived from racing be set aside for the general improvement of the sport and the facilities used." (22 N Y 2d, at pp. 122-123). Respondents would have us read Saratoga as holding that the State may constitutionally share pari-mutuel revenue with other entities, a fortiori, local municipalities included. Saratoga merely required the racing associations to set aside some of their revenue to improve the facilities used, a proper legislative determination. Saratoga does not stand for the sweeping proposition which respondents contend, but rather, in my view, tends to support appellants' position. It must be pointed out that in Saratoga, the Legislature in effect, reduced the track's share of the "breakage" money so that the sport itself may have been improved. In addition, the allocation of the money was specifically delineated by the Legislature (§ 55-c; L. 1965, ch. 567). In the instant legislation, the Legislature has opened the door to numerous potential OTB systems (possibly as many as 62) without the State's deriving a substantial amount of the revenue in violation of article I (§ 9). Article I (§ 9) mandates that it was to be State revenue to be derived from pari-mutuel betting[*], hence, the instant legislation runs afoul of article VII (§ 7) of the State Constitution.
In essence, article VII (§ 7) requires that State funds must be paid out pursuant to an appropriation by law. Looking behind the present off-track betting enactment, the revenue derived from pari-mutuel betting is properly State money within the meaning of article VII (§ 7). The off-track betting statutes circumvent the requirement of appropriation by law and respondents ask us to take judicial notice that the State is merely a "conduit" through which moneys are transmitted back to local units for local purposes. It is no answer to say that local governments are creatures of the State and that the revenue raised is being used for public purposes. This argument ignores the plain language of the applicable constitutional provisions.
*224 The object of article VII (§ 7) is clear: "to prevent the legislature from pledging the revenues for more than two years in advance, and compel them to review them every year, to ascertain what appropriation would be necessary" (2 Lincoln, Constitutional History of New York, p. 184). Since the off-track betting statutes provide for disbursement of State funds without such appropriation, they contravene the constitutional controls envisaged by this provision. In effect, the off-track betting laws sanction the disbursement of large sums of State funds without the Legislature's maintaining proper supervision of the moneys. This absence of State control over the revenue, in my view, vitiates the off-track betting system as presently operated.
Concluding that the off-track betting statutes are unconstitutional, it is not necessary to discuss the other arguments advanced by the appellants for reversal which I find have no merit.
Departing from the constitutional questions raised, there is the practical problem that validating the present off-track betting structure will have a deleterious effect on the racing industry in the State. This is due to the rippling effect which the proliferation of off-track betting systems will have on the racing industry in general. As attendance dwindles with the concomitant decline in admission and betting revenues, the tracks are compelled to maintain the quality of their 1969 program in order to obtain their statutory reimbursement. With escalating costs, the tracks will have less money to channel back into winning purses, thus, in the long run, making the New York tracks less attractive competitively. Dependent as the State is on the revenue for the support of State government obtained from racing, it is only necessary to note that prior to the enactment of off-track betting legislation, the owners of the stables and horses and the trainers threatened to withdraw from racing in New York State. It was only through the intervention of Governor Rockefeller, who assured them that purses would be improved, that they agreed to continue to race in New York. There is the ever-present threat that as track revenues plummet and purses are reduced, the best stables, horses, jockeys and industry personnel will no longer be racing in New York as New York will not be able to compete favorably with out-of-State tracks.
Of course, if off-track betting is completely controlled by the State, the State could see to it that there would be an equitable *225 apportionment between the racing industry and the State by adjusting the purses. Thus, the New York State racing industry's continued viability will be fostered by a State take-over of the system. Such a take-over would be in the interests of the people of New York as it would ensure that the optimum amount of income able to be obtained from the coexistence of on-track betting and off-track betting would in fact be raised.
Accordingly, the judgment appealed from should be reversed and judgment entered declaring chapters 143, 144 and 145 of the Laws of 1970 unconstitutional.
Chief Judge FULD (dissenting).
I, too, believe that chapters 143 and 144 of the Laws of 1970 are unconstitutional on the ground that they contravene article I (§ 9) and article VII (§ 7) of our State Constitution. Accordingly, I am in general agreement with what Judge BURKE has written with respect to those chapters. However, I go further than he does for, in my view, the provisions for compenstaion contained in the challenged legislation are unconstitutionally inadequate and deprive the tracks of property rights without due process of law (U. S. Const., 14th Amdt.; N. Y. Const., art. I, §§ 6, 7). Although compensation is given for the use of tangible facilities at the tracks, no compensation is provided for the other, intangible items which are also appropriated. (Cf. Matter of Keystone Assoc. v. Moerdler, 19 N Y 2d 78, 88-89; Matter of City of New York [Fifth Ave. Coach Lines], 18 N Y 2d 212.)
Judgment affirmed.
NOTES
[*] Subsequent to the amendment authorizing pari-mutuel betting, three governmental committees studied article I (§ 9) and were of the opinion that only State revenue was to be produced. (See Select BiPartisan Committee on Off-Track Betting, N. Y. Legis. Doc., 1964, No. 32, p. 10; Joint Legislative Committee To Study All Laws, Rules and Regulations Relative To Horse Racing, Interim Report, N. Y. Legis. Doc., 1952, No. 49; 1941 Joint Committee to Study the Pari-Mutuel System, N. Y. Legis. Doc., 1941, No. 69.)