138

LOUIS HEIMBACH, Individually and as County Executive of Orange County, on Behalf of All Persons in Orange County Liable for the Payment of Sales and Use Taxes, et al., Respondents-Appellants, v STATE OF NEW YORK et al., Appellants-Respondents, and WARREN M. ANDERSON, as Temporary President and Majority Leader of the New York State Senate, Intervenor-Appellant-Respondent.

Second Department, October 18, 1982

APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General (Richard G. Liskov, Daniel Kaplan, Dennis H. Allee, Peter H. Schiff* and *George D. Zuckerman* of counsel), for appellants-respondents.

*James G. Sweeney, County Attorney,* for respondents-appellants.

*John F. Haggerty (William Y. Crowell, III,* of counsel), for intervenor-appellant-respondent.

### OPINION OF THE COURT

*Per Curiam.*

Chapter 485 of the Laws of 1981[1] (Senate Bill 1905; Assembly Bill 9059) increases by one quarter of 1% the sales and compensating use tax of the State within the Metropolitan Commuter Transportation District (MCTD), a 12-county area served by the Metropolitan Transportation Authority (MTA). Orange and Suffolk Counties are included in the MCTD (Public Authorities Law, § 1262).

As recorded in the Journal of the Senate, Senate Bill 1905 was passed by that body with the minimum number[2] of affirmative votes required by the State Constitution (NY Const, art III, § 14). The voting procedure employed is known as the "fast" roll call, and one of the affirmative votes recorded is that of Senator Howard Nolan. It is not disputed that when the vote was taken, Senator Nolan was a patient in the hospital being prepared for elective surgery. The bill was certified as passed on July 8, 1981 by the Speaker of the Assembly and the Acting President of the Senate. It was approved by the Governor on July 11, 1981 and became effective on September 1, 1981.

In this action by the County Executives of Orange and Suffolk Counties against the State of New York and James H. Tully, Jr., as the Commissioner of the New York State Tax Commission, the third cause of action seeks a judgment declaring that chapter 485 of the Laws of 1981 is not a duly enacted law of the State of New York. The plaintiffs also seek a declaration that the tax scheme created by chapter 485, in its operation and effect, "violate[s] the Equal Protection Clause of the Fourteenth Amendment of

---

1. Chapter 485 of the Laws of 1981 is codified as section 1109 of the Tax Law.
2. 31 of the 60 members of the State Senate.

the United States Constitution" with respect to both Orange County (first cause of action) and Suffolk County (second cause of action).

Plaintiffs moved for summary judgment on the third cause of action and defendants cross-moved for summary judgment dismissing the complaint in its entirety, *inter alia,* for failure to state a cause of action. Special Term (113 Misc 2d 189) held that on the facts in this case, the assent of Senator Nolan on a "fast" roll call contravened the mandatory proscription of the State Constitution with respect to the passage of a bill, granted the plaintiffs' motion and declared that the said chapter of the Laws of 1981 had not become a law. The defendants' cross motion was denied as moot, and Special Term did not reach the other constitutional issues sought to be raised. Defendants now appeal from the judgment at Special Term and plaintiffs appeal from an order which denied their application for class action certification. This court has granted the application of Warren M. Anderson, as Temporary President and Majority Leader of the Senate, for leave to intervene as a defendant-appellant.

■ The judgment should be reversed. On the facts as set forth in this record, chapter 485 of the Laws of 1981 was validly enacted into law. We also reject the other challenges raised by the plaintiffs to the validity of this chapter. In light of this determination, plaintiffs' appeal from the order denying class certification is academic.

Initially, we observe that while "in general the courts will not interfere with the internal procedural aspects of the legislative process, judicial review may be undertaken to determine whether the Legislature has complied with constitutional prescriptions as to legislative procedures (*Norwick v Rockefeller,* 33 NY2d 537; *Matter of Schneider v Rockefeller,* 31 NY2d 420; *Finger Lakes Racing Assn. v New York State Off-Track Pari-Mutuel Betting Comm.,* 30 NY2d 207, 219-220; *People v Devlin,* 33 NY 269; *Franklin Nat. Bank of Long Is. v Clark,* 26 Misc 2d 724)." (*Matter of Board of Educ. v City of New York,* 41 NY2d 535, 538.)

Howard Nolan, who has been a member of the State Senate since January 1, 1975, was scheduled to undergo elective surgery on July 9, 1981. On the morning of July 8,

1981, he entered the Senate chamber and had himself designated as present by the clerk of the Senate. Later in the day, he left the Senate without informing the clerk, first going home and then to the hospital. At some time during that day, Assembly Bill 9059, which provides for a quarter of one percent increase in the sales and compensating use tax in the MCTD, was passed by the Assembly and forwarded to the Senate as part of a package of tax bills designed to improve transportation in the district. During the early morning hours of July 9, while Senator Nolan was in the hospital, a vote was taken on Assembly Bill 9059 (Senate Bill 1905) by means of the "fast" roll call. According to the entry in the Senate Journal, the Senate voted 31 to 26 in favor of the bill, with three Senators "excused". The vote of Senator Nolan is included among the 31 "Aye" votes, which is the minimum number of votes required for passage.

Our State Constitution requires that no bill "shall * * * be passed or become a law, except by the assent of a majority of the members elected to each branch of the legislature" (NY Const, art III, § 14), but the Constitution has prescribed no method of determining the assent of a majority (cf. *United States v Ballin,* 144 US 1, 6). Section 9 of article III of the Constitution vests in each house of the Legislature the power to determine the rules of its own proceedings. In the exercise of that power, the Senate has adopted rules VIII (§ 6) and IX (§ 1) which provide:

Senate Rule VIII, Passage of bills:

"6. Final Passage. The question on the final passage of every bill shall be taken immediately after the third reading and without debate. On the final passage of every bill, a roll call shall be taken by the Secretary calling the names of five Senators, two of whom shall be the Temporary President and the Minority Leader, provided however, that each Senator's name shall be called if requested by five Senators. Each roll call shall be entered on the journal. Such roll calls shall be available for public inspection upon request in the office of the Journal Clerk. When a bill does not receive the number of votes required by the Constitution to pass it, it shall be declared lost, except in cases

provided for by subdivision d of section two of Rule 9 hereof."

Senate Rule IX, Senators:

"Section 1. Attendance and Vote.

"a. Every Senator shall be present within the Senate Chamber during the sessions of the Senate, unless duly excused or necessarily prevented, and shall vote on each question stated from the Chair unless excused by the Senate, or unless he has a direct personal or pecuniary interest in the event of such question. If any Senator refuses to vote, unless he be excused by the Senate, or unless he be interested, such refusal shall be deemed a contempt."

The Senate voting procedures are described by Senate Minority Leader Manfred Ohrenstein as follows:

"4. To vote for the passage of a bill a senator must be present on the day the particular vote is taken. Presence is established under the senate rules and customs by a senator's physical entry into the chamber at some point during a session day. However, * * * a senator's *presence in fact* as opposed to his above described *designated* presence is not necessary for his vote to be cast, in most cases.

"5. Under the rules of the senate, voting on the final passage of bills may take place under one of two methods — a fast or slow roll call (Rule VIII, § 6). On a fast roll call, a vote is taken by calling the names of five senators, including the Temporary President, the Minority Leader and three others usually the first and last two senators on the alphabetically arranged senate roll call list. What is particularly important to note under the fast roll call method of voting is that under a long established senate custom, a senator who has had his presence designated by the clerk of the senate, as described in '4' above, need not be in the chamber to have his or her vote counted in the affirmative. In other words, a senator who has had himself or herself marked present will be deemed to be voted in the affirmative on any particular vote even if in fact he or she is in his or her office or elsewhere at the time the vote occurs. To vote in the negative, however, a senator must be in the chamber and indicate a negative vote by a show of hand.

"6. This practice is not followed in a slow roll call. Here, after five senators have stood to request this voting process, each of the sixty senator's [sic] names are called, and only those members answering 'aye' or 'nay' to their names are recorded as having voted. Those members not responding when their names are called are recorded as having not voted on the measure despite the fact that they may have already been designated present for that day's senate session (See Rule 8, Sec. VI [sic]) * * *

"11. Under the rules of the senate a senator who has not had himself designated as present (See paragraph 4 above) is recorded as absent on every roll call vote unless such absence has been excused by the senate. Once a senator is present as described above he or she is voted on each fast roll call vote, present in fact or not, unless excused by the senate (Rule 9, Sec. 1 [sic]). The normal practice for excusing a senator who has had himself designated as present and then who wants to leave is for that member or another member to rise and request of the senate to excuse him or her from voting on further items, which such excuse is generally accepted by the majority without objection. In the case of excusing someone who has not had himself designated as present, the clerk is generally notified of the requested excused absence by my staff at the end of a session and the senate approves it or not on the following day when it approves the preceeding [sic] day's journal."

According to the intervenor, Senator Anderson, 97.9% (1,954 of a total of 1,995) of all bills voted on in 1981 "passed on a fast roll call vote."

Senator Nolan stated in his affidavit in support of plaintiffs' motion for summary judgment on the third cause of action, that "for at least the past seven years while I have been a member of the New York State Senate, it has been the custom, and still is the custom in the Senate on the Minority side, to arrange for an excused appearance through the office of the Minority Leader, i.e., Senator Manfred Ohrenstein. I have used this procedure on several occasions in the past and have never questioned the same, relying on tradition and custom." In "accordance with custom", he claims that he informed Senator Ohrenstein in person, the previous week, that he was entering the hospi-

tal the night of July 8 to undergo elective surgery. After he left the Senate on July 8, he received a telephone call at home from Senator Ohrenstein's administrative assistant who informed him that there would probably be a vote later that evening on the subject package of bills and that his presence was needed because the vote on several of the bills was likely to be close. In Senator Nolan's words: "Senator Ohrenstein came to the phone and I reminded him of our conversation of the previous week, which he acknowledged and said that he had forgotten about the fact that I was entering the hospital. I also reminded him that I had told him previously that I would not help his cause in any event, as I would have voted against all of the proposed taxing measures if I were present, and would probably speak against some of them, which was obviously a position contrary to that of the Democratic leadership in the Senate. Senator Ohrenstein acknowledged my previous conversation concerning my hospitalization, wished me good luck, and personally assured me that I would be marked 'excused because of being in the hospital' for any votes taken that evening or on the following day."

Senator Ohrenstein responded:

"The crux of plaintiff's [sic] argument however appears to revolve around Senator Nolan's allegations that he attempted to have his designation as 'present' converted to an excused absence by making this request of me by telephone sometime in the evening of July 8, 1981 * * *

"[F]rom a legal perspective, assuming the accuracy of Senator Nolan's recollection, any request to be excused that he might have made of me does not in any way insure that such designation would be forthcoming. Moreover, there is no legal obligation on my part to even convey his request to the senate, although as matter of senate courtesy and leadership responsibility, any such reasonable request would generally be honored. In other words, I could choose not to ask that a senator be excused in which case if a senator was not able to have himself or herself excused in the manner described above he or she would be considered absent for votes if he or she had not checked in and as voting in the affirmative on fast roll calls if he or she had checked in * * *

"I acknowledge that Senator Nolan called me on the evening of July 8, 1981 to discuss his pending hospitalization. I have however no recollection whatsoever of any request that he be excused. Moreover, even had this request been made, as alleged, it would have had no effect on the casting of Senator Nolan's votes. The reason for this is that at that time I was under the clear impression that Senator Nolan was absent that day and therefore not voting on any issue. Thus, even if I had knowledge of this request it would have only meant to me that he wanted his absence to be considered an excused absence and not that he wanted his status as 'present' to be converted to the status of 'excused absence'. At best, then, my staff would have informed the journal clerk of the request at the end of the session — after the vote complained of had occurred." Noting that of "the eight bills relating to the MTA six * * * were passed by fast roll call and two * * * by slow roll call", Senator Ohrenstein asserted that "Senator Nolan who was not in the chamber at the time was properly recorded in the affirmative on the six (6) fast roll call votes and as not voting (slash through his name) on the two slow roll calls."

In a supplemental affirmation, Senator Ohrenstein claimed that under the Senate rules, "the challenged roll call accurately reflects the vote on the MTA sales tax", and added "This conclusion is not in any way affected by whether or not Senator Nolan requested that I have him excused. As I stated in my supporting affirmation, despite my inclination to honor such request, I have no legal obligation to do so and even if I were to do so, that would not guarantee that the Senate would accept such request. Moreover * * * even if I had been cognizant of the request, which I was not, and inclined to honor it, given this particular situation, I would have understood such a request not as one asking that a 'present' Senator be excused but that an 'absent' senator have such absence be characterized as 'excused'."

Before Special Term, the plaintiffs admitted that: "For purposes of this motion, it will be conceded that for Senators in presence and making up part of the quorum which allows the Senate to proceed in the first place, a failure or

refusal to vote for whatever reason, including perhaps an abstention will be deemed as a vote in favor of the measure before the Senate. A Senate Rule of custom so provides." The plaintiffs contended, however, that such was not the case here, since Senator Nolan was not in presence and did not make up part of the quorum which allowed the Senate to act on the bill in the first place.

The Constitution provides that "[a] majority of each house shall constitute a quorum to do business" (NY Const, art III, § 9). The Senate rules require every Senator to be "present" and to "vote" (rule IX, § 1). Section 2 of rule IX pertinently provides:

§ 2. Quorum.

"a. A majority of all the Senators elected shall constitute a quorum to do business. In case a less number than a quorum of the Senate shall convene, those present are authorized to send the Sergeant-at-Arms, or any other person, for the absent Senators * * *

"f. If at any time during the session of the Senate a question shall be raised by any Senator as to the presence of a quorum, the Presiding Officer shall forthwith direct the Secretary to call the roll, and shall announce the result, and such proceeding shall be without debate; but no Senator while speaking shall be interrupted by any other Senator raising the question of a lack of a quorum, and the question as to the presence of a quorum shall not be raised oftener than once in every hour unless the lack of a quorum shall be disclosed upon a roll call of the ayes and nays.

"g. Whenever upon a roll call any Senator who is upon the floor of the Senate Chamber refuses to make response when his name is called, it shall be the duty of the Presiding Officer, either upon his own motion or upon the suggestion of any Senator, to request the Senator so remaining silent to respond to his name, and if such Senator fails to do so, the fact of such request and refusal shall be entered in the journal, and such Senator shall be counted as present for the purpose of constituting a quorum."

The rules provide no means for determining when a Senator is "present" or "upon the floor of the Senate Chamber".

The Senate rules generally do not set forth basic parliamentary rules and details. When the Legislature has not adopted rules for a particular subject or purpose, it " 'is governed by the generally accepted rules of parliamentary procedure which flow from general principles of common law' " (*Matter of Board of Educ. v City of New York*, 41 NY2d 535, 541, n 3, *supra*, quoting from *Matter of Anderson v Krupsak*, 40 NY2d 397, 405). Under recognized principles of parliamentary law, where "it appears that a quorum was present at a certain time, and it does not appear that after that time there was an adjournment, it will be presumed that the quorum continued to be present" (67A CJS, Parliamentary Law, § 6, p 619; see Robert's Rules of Order [newly revd ed], § 39, p 296). By longstanding custom, a Senator's presence is established by his actual entry into the chamber at some point during a session day and having himself marked present by the clerk of the Senate. Thereafter, his presence is presumed to continue unless he requests that he be excused or informs the clerk of his departure.

The Senate rules and custom are a reasonable and practical interpretation of the constitutional requirement (cf. *United States v Ballin*, 144 US 1, 5-6, *supra*); *People ex rel. Hatch v Reardon*, 184 NY 431, 442). As the plaintiffs concede in their brief, under general principles of parliamentary law there is a presumption that Senators present in the chamber and not recorded as voting are presumed to have voted in the affirmative (see 59 Am Jur 2d, Parliamentary Law, § 9, p 325, n 12; 43 NY Jur 2d, Parliamentary Law, § 14, p 24, n 20; 67A CJS, Parliamentary Law, § 8, p 620; *Cowan v New York Caledonian Club*, 46 App Div 288).

Senator Nolan was scheduled to enter the hospital on July 8, 1981 for elective surgery to be performed the next day. On July 8, he had himself designated as "present" by the clerk of the Senate and left some time later in the afternoon without asking to be excused, as the rules provide, and without informing the clerk. There is no claim that he was prevented from reporting his departure to the clerk. As an experienced Senator, he must have known that he would be recorded as voting in the affirmative on

every "fast" roll call for the remainder of the July 8 session day.

In their brief, the plaintiffs admit that the "fast" roll call "is an expeditious way of handling the volume of legislation that comes before the Senate." On oral argument of the appeals, the plaintiffs conceded that on these facts, *so far as the "fast" roll call is concerned,* the recording of Senator Nolan's vote as affirmative was not constitutionally impermissible. Accordingly, the issue of whether a "fast" roll call violates the mandate of the Constitution is not before us and we express no view as to whether the Senate rules and custom as embodied in the use of the "fast" roll call voting procedure conforms to the constitutional prescription (see NY Const, art III, § 14; see, also, *People ex rel. Scott v Supervisors of Chenango,* 8 NY 317, 328).

As represented at oral argument by the plaintiffs, the gravamen of their complaint with respect to the third cause of action is that the Senate rules and custom were not observed in that Senator Ohrenstein failed to have Senator Nolan marked "excused because of being in the hospital" for any votes taken on the evening of July 8 or on the following day.

While there is a dispute as to the content of their conversation, it is agreed that Senator Ohrenstein had a telephone conversation with Senator Nolan at his home the evening of July 8. For the purposes of this argument, we assume, as Senator Nolan contends, that there has been an unwritten custom in the Senate for a member to arrange for an excused appearance through the office of the Minority Leader, Senator Ohrenstein, that Senator Nolan informed Senator Ohrenstein that he had registered with the clerk on July 8, and that Senator Ohrenstein agreed to arrange to have him marked "excused" but neglected to do so.

Courts may not "impeach the validity of [a] law, by showing that in its enactment some form or proceeding had not been properly followed or adopted by the legislature, the supreme law-maker" (*People v Devlin,* 33 NY 269, 283). "[R]espect for the basic policy of distribution of powers in

our State government, and the exercise of a proper restraint on the part of the judiciary in responding to invitations to intervene in the internal affairs of the Legislature as a co-ordinate branch of government [are most important] — 'it is not the province of the courts to direct the legislature how to do its work'. (*People ex rel. Hatch v Reardon,* 184 NY 431, 442; cf. *Norwick v Rockefeller,* 33 NY2d 537.)" (*New York Public Interest Research Group v Steingut,* 40 NY2d 250, 257.) Judicial review of every internal dispute between the members of the Legislature "would frustrate the legislative process and violate" the constitutional principle of separation of powers (*Matter of Anderson v Krupsak,* 40 NY2d 397, 403, *supra*).

Accordingly, we hold that chapter 485 of the Laws of 1981 was validly enacted, the plaintiffs' motion for summary judgment on the third cause of action should be denied, and judgment should be granted defendants on that cause of action.

We turn now to the other constitutional issues raised by the plaintiffs. The crux of the allegations in the first two causes of action pertains to the disproportionate benefits received by the residents of Orange and Suffolk Counties. Thus it is alleged, *inter alia,* that only a small percentage of the residents of these counties utilize MTA facilities; that the primary purpose of the new tax is to fund a deficit in the operation of those MTA facilities which "primarily * * * benefit the occupants, residents and business inhabitants of New York City"; that the ratio of taxes generated in each county within the MCTD will vary because of geographic location, population and economic base, will bear no relation to the services rendered within each county and will result in Orange and Suffolk Counties being "heavily" discriminated against; and that the statutory scheme based on geographic location has no justification, is arbitrary and capricious and bears no reasonable relation to any legitimate State objective.

The verified answer contains general denials and asserts, *inter alia,* as an affirmative defense that chapter 485 is a constitutional exercise of the taxing authority of the Legislature. The defendants' cross-moved pursuant to CPLR 3212 for summary judgment, *inter alia,* on the

ground that the complaint fails to state a cause of action. The supporting papers include an affidavit by David Z. Plavin, acting executive director of the MTA, and a copy of the "comprehensive plan and action program" prepared by the MTA's predecessor, the Metropolitan Commuter Transportation Authority, at the request of former Governor Nelson A. Rockefeller and submitted to him in February, 1968. Mr. Plavin describes in some detail the various transportation services provided by the MTA in Orange and Suffolk Counties. For example, in Orange County the MTA operates the Port Jervis line, for which new cars and locomotives have been acquired, and Stewart Airport, in which MTA has invested in excess of $30,000,000 in capital improvements, and in Suffolk County, the MTA operates the Long Island Railroad to Huntington, recommended improvements to which have been substantially completed, and Republic Airport. Since the acquisition of the two airports, the MTA has operated them and funded their operating deficits, which typically exceed $1,000,000 per year.

In their brief to this court, the plaintiffs urge that the defendants' cross motion, while nominally one for summary judgment pursuant to CPLR 3212, is essentially a motion pursuant to CPLR 3211 (subd [a], par 7) addressed to the sufficiency of the pleadings and that the supporting papers are at best conclusory and inaccurate. The plaintiffs note that neither Stewart nor Republic Airport is included as a recipient of any portion of the funds appropriated by chapter 485.

The plaintiffs, citing *Matter of Long Is. Light. Co. v State Tax Comm.* (45 NY2d 529, 535-536), concede that "a legislature having the power to impose taxes has wide latitude in creating districts and zones of taxation and * * * even wider latitude in creating various classifications for purposes of taxation [and] * * * that even a flagrant uneveness [*sic*] in the application of a tax is of virtually no moment and will not form the basis of a successful attack upon the tax." However, they claim that they are not arguing disparate benefit. They call attention to the allegations in the complaint to the effect that "the taxes imposed by Chapter 485 will be at different ratios amongst

all the counties within the MTA transportation district" and are based "only upon a geographic distinction that is capricious and arbitrary, devoid of any reasonable consideration of differences between or policy extending to the several MTA commuter district counties." They also contend that Mr. Plavin's supporting affidavit on the cross motion does not address or deny these allegations. "While distinctions based on geographical areas are not, in and of themselves, violative of the Fourteenth Amendment, Salsburg v. Maryland, 346 U.S. 545 * * * a state must demonstrate, if it wishes to establish different classes of property based upon different geographical localities — e.g., rural areas as opposed to urban areas — that the classification is neither capricious nor arbitrary but rests upon some reasonable consideration of difference or policy. State Board of Tax Comm'rs of Indiana v. Jackson, 283 U.S. 527, 537" (*Weissinger v Boswell,* 330 F Supp 615, 623-624; see, also, *San Antonio School Dist. v Rodriguez,* 411 US 1, 28, n 66).

■ Even if we take judicial notice of the economic, geographic and demographic differences between Orange and Suffolk Counties and the other counties within the MCTD, these differences do not demonstrate that the challenged tax scheme does not pass constitutional muster.

The cases on which the plaintiffs rely are inapposite on their facts (*Tax Comrs. v Jackson,* 283 US 527, *supra; McCarthy v Jones,* 449 F Supp 480; *Weissinger v Boswell, supra*). As the defendants correctly state: "It is undisputed that there are MTA services and facilities in those counties, utilized by residents of those counties, that are either directly or indirectly subsidized with the revenue raised by the sales tax increase. It is undisputed that there are significant links between these two counties and the rest of the metropolitan area in which the MTA operates * * * it is undisputed that residents of these two counties have long had an opportunity to participate, in MTA's policy deliberations. Public Authorities Law § 1263(1) (a)." That the crux of the plaintiffs' complaint is the disproportionate benefits received by the users of the MTA facilities in Orange and Suffolk Counties is demonstrated by the following statement in the plaintiffs' brief: "In short, the Plavin affidavit does not address at all the internal dispro-

portional or disparate effect of the sales tax among the several counties within the MTA commuter district. That and that alone is the central theme of the plaintiffs' complaint."

The remaining grounds on which the validity of chapter 485 is attacked are therefore unavailing. The defendants' cross motion for summary judgment should be granted and chapter 485 of the Laws of 1981 declared to have been duly enacted into law and to comply with the equal protection clause of the Fourteenth Amendment to the Federal Constitution.

In view of our determination, we need not decide whether the plaintiffs' application for class action status was properly denied. However, if we were to reach that issue, we would affirm for the reasons stated by Special Term.

TITONE, J. P., GIBBONS, WEINSTEIN, GULOTTA and THOMPSON, JJ., concur.

Judgment of the Supreme Court, Orange County, dated March 24, 1982, reversed, on the law, without costs or disbursements; plaintiffs' motion for summary judgment on their third cause of action is denied, defendants' cross motion for summary judgment is granted and it is declared that chapter 485 of the Laws of 1981 was validly enacted and that it complies with the equal protection clause of the Federal Constitution.

Appeal by plaintiffs from an order of the same court, dated March 17, 1982, dismissed as academic, without costs or disbursements.